# Case No. 14,465.

## UNITED STATES v. The ARIADNE.

[Fish. Pr. Cas. 32.]

District Court, D. Pennsylvania. Feb. 14, 1812.[1]

PRIZE—DUTY OF CAPTORS TO SEND IN WITNESSES—SAILING UNDER ENEMY'S LICENSE—BILLS OF EXCHANGE—PROBABLE CAUSE.

[1. It is reprehensible negligence and misconduct in a captor to neither send in with the vessel nor produce for examination upon the standing interrogatories any witnesses found on board her, and the court will not permit claimants to be delayed on this account.]

1 [Reversed by the circuit court (case unreported). The decree of circuit court was affirmed by supreme court. 2 Wheat. (15 U. S.) 143.]

[2. A trading voyage by an American vessel is not made unlawful by directing that the proceeds shall be remitted to American citizens detained in the enemy's country, in bills of exchange drawn upon that country.]

[3. Sailing by an American vessel on a voyage to a neutral country under a license or passport issued by one of the enemy's admirals and certified by an ex-consul, resident in the United States, under his seal, does not make the voyage illegal even if it should appear that money was paid to such ex-consul for the same.]

[4. "Probable or reasonable cause" of capture must be shown to rest on strong facts apparent at the time of capture; such as double papers for purposes of deceit being false and colorable, want of proper ship's papers, prevarication by the master or other officers and crew examined in preparatorio.]

The libel is in the common technical form. The vessel and cargo are proceeded against as "belonging to the government of the United Kingdom of Great Britain and Ireland, or to persons being subjects thereof, and as such, or otherwise, liable to confiscation and condemnation," &c. It is conceded, and if it were not, it appears by the papers found on board, and exhibited by the captors, that both vessel and cargo are bona fide the property of citizens of the United States; and the cargo, consisting of flour, belonging, in certain designated portions, to the owner of the ship, Nathaniel Goddard, and other citizens of the United States, was laden on board, at the ports of Baltimore and Alexandria, from which latter port she sailed on a voyage to Cadiz in Spain; and in the prosecution of her voyage, she was captured by the Argus [Arthur St. Clair, commander] and sent as prize into the port of Philadelphia. No circumstances of improper conduct in the captured inducing suspicion, are either shown or alleged. On the contrary, by a most unwarrantable misconduct in the captor, no witness or witnesses, is or are sent in with the vessel, or produced for examination upon the standing interrogatories. After the hearing had commenced, the master who had been detained on board the Argus, was sent from New York; but much too late for legal examination, according to the established course of proceeding. The court, whose duty it is to examine as well into the circumstances occurring at the time of capture, as they relate to the capture, as into the conduct of cruisers; is bound to pronounce its marked disapprobation of negligence so gross. In such cases the court has established a rule, that claimants shall not be delayed on this account. In cases where no claimants appear, all proceedings for the purposes of condemnation will be stayed. Instances of such negligence have been multiplied; and have forced on the court a determination, so far as its powers extend, to reform a mal-practice, which may be attended with consequences highly mischievous.

The hearing in this cause having been delayed; the court, conceiving itself warranted by the state of the season, the situation of the ship, and the circumstances of the case,

directed both vessel and cargo to be delivered to the claimants, on giving security, in the appraised value, to abide the final sentence and decree of this court, and the court or courts of appeal. That the situation of the vessel and cargo might be known, as it was at the time of its being placed in the custody of the marshal, and of its delivery over to the claimants; the court directed an inventory to be taken, and filed, and ordered a survey of the ship, her tackle, apparel and furniture. It is superfluous to state more of the documents and papers exhibited than such as are relied on by the captors, either for condemnation, or justification, or what are otherwise materially necessary in the case. The cargo, by all the shippers, was consigned to Captain William Farris, who went as supercargo in the vessel. He was instructed to sell the cargo, consisting wholly of flour, at Cadiz, and to remit the proceeds, in good bills on London; the greatest proportion to Samuel Williams, Esq. merchant, No. 13, Finsbury Square, for account of the shippers. There are instructions to Farris, from all the shippers, to the same purpose; except those from Samuel May, owner of 500 barrels of the flour, which are in these words: "The nett proceeds of five hundred barrels of flour, which you have of mine in your consignment, you will please, when realized remit to Henry Bromfield, Esq. merchant, London, for my account; in such mode as you may judge most for my interest." In the instructions from Nathaniel Goddard, the owner of the vessel and part of the cargo to William Farris, dated Boston, September 9th, 1812, he mentions (after directing his share of the proceeds sold at Cadiz to be invested in bills and remitted to Samuel Williams, Esq. in London): "From recent interruptions of regular supplies of flour at Cadiz, we are led to believe, that the demand for this article will be such as to insure you a valuable market, in the event of safe arrival; nor can we entertain a doubt, that the policy of Great Britain will lead her cruisers to abstain from offering any impediment to the free passage of vessels destined for Spain and Portugal; under this impression we have been induced to make the shipment now under your care, firmly believing that the same indulgences which have occasionally been extended to Sweden and other enemies, by Great Britain, will be shown to ships of the United States, carrying supplies absolutely necessary for the suffering inhabitants of Spain." "You will also please to remit the sum of nineteen hundred and ten dollars, to Samuel Williams, Esq. London, for account of Samuel F. Coolidge, Esq. of this place, to be assessed on the whole cargo." "As it is possible some unforeseen event may turn up, in the course of the voyage, you will act, in such case, as you may think prudent, and most conducive to the interest of the concerned; being careful not to violate any laws or regulations of the Unit-

ed States, or the municipal, or other regulations, of the place you may visit." The instructions from Nathaniel Goddard, dated 14th September, 1812, at Boston, to Bartlet Holmes the master, direct him to invest and remit the amount of freight (paid by Farris for account of other shippers) "in good bills on London (except what may be wanted to purchase salt, and for other disbursements) at the best possible rate, to Williams in London, for my account, and subject to my orders." He enjoins against detention of the ship, even if it were to ballast with salt, but orders him to proceed directly back to Alexandria for another cargo. He repeats, in epitome, his ideas as to the policy of Great Britain; and adds, "I trust the same will be shown to us, her declared enemies, carrying supplies for her suffering allies, the patriotic inhabitants of Spain; and on returning with salt to the United States, for the continuation of the same business. But as there are other cruisers on the ocean, it will be prudent to avoid if possible speaking with any vessel, of any description, on either of your passages. You will, on entering Cadiz bay, avoid the French side with great care, that you may not meet with cruising boats. You will take no cargo or adventures, but flour, and nothing home but salt, and be careful that no adventures are clandestinely stowed away, to expose the safety of the ship; and in no case, violate any laws of Spain, or the United States."

At the time of capture, there was found on board the Ariadne, and exhibited among the papers delivered into the custody of the clerk of this court, the passport, or by whatever name it is called, whereof the following is a copy:

"(Stamp. Arms of the British king.) Office of his Britannic Majesty's Consul. I, Andrew Allen, Jr. his Britannic majesty's consul, for the states of Massachusetts, New-Hampshire, Rhode Island, and Connecticut, hereby certify that the annexed paper is a true copy of a letter addressed to me by Herbert Sawyer, Esq. vice admiral and commander in chief on the Halifax station. Given under my hand and seal of office, at Boston in the state of Massachusetts, this ninth day of September, in the year of our Lord, one thousand eight hundred and twelve. (Signed) Andrew Allen, Jr. (Consular Seal.)

"To the commanders of any of his majesty's ships of war, or of private armed ships belonging to subjects of his majesty: Whereas from a consideration of the great importance of continuing a regular supply of flour and other dry provisions to the ports of Spain and Portugal, it has been deemed expedient by his majesty's government, that notwithstanding the hostilities now existing between Great Britain and the United States of America, every protection and encouragement should be given to American vessels so laden with flour and other dry provisions, and bound to the ports of Spain and Portugal,

And whereas in furtherance of these views of his majesty's government, and for other purposes, Herbert Sawyer, Esq., vice admiral and commander in chief of his majesty's squadron on the Halifax station, has directed to me a letter under date of the fifth of August, 1812, a copy whereof is hereunto annexed, and wherein I am instructed to furnish a copy of his letter certified under my consular seal, to every vessel so laden and bound either to any Portuguese or Spanish ports, and which is designed as a safe guard and protection to any such vessel in the prosecution of such voyage. Now therefore in pursuance of these instructions I have granted unto the American ship Ariadne, Bartlet Holmes master, burthen three hundred and eigthy two 2/85th tons, now lying in the harbour of Alexandria, laden with flour and bound to Cadiz or Lisbon, the annexed documents to avail only for a direct voyage to Cadiz or Lisbon, and back to the United States of America. Requesting all officers commanding his majesty's ships of war or private armed vessels belonging to subjects of his majesty, not only to suffer the said ship Ariadne to pass without any molestation, but also to extend to her all due assistance and protection in the prosecution of her voyage to Cadiz or Lisbon; and then return thence laden with salt or other merchandise to the nett amount of her outward cargo, or in ballast only. Given under my hand and seal of office at Boston, this fifth day of September, A. D. 1812. (Consular Seal.) Andrew Allen, Jr. His Majesty's Consul."

"(Copy.) His Majesty's Ship Centurion at Halifax, the 5th August, 1812. Sirs: I have fully considered that part of your letter of the 18th ult. which relates to the means of insuring a constant supply of flour and other dry provisions to Spain and Portugal, and to the West Indies, and being aware of the importance of the subject, concur in the propositions you have made. I shall therefore give directions to the commanders of his majesty's squadron under my command, not to molest American vessels so laden and unarmed, bona fide bound to Portuguese or Spanish ports, whose papers shall be accompanied with a certified copy of this letter under the consular seal. I have the honour to be, sir, your most obedient humble servant, (Signed) H. Sawyer, Vice Admiral.

"Andrew Allen, British Consul, Boston."

PETERS, District Judge. I have given to this case as much of my attention as I could bestow; and confess myself at a loss to find the relevancy of many of the authorities, and of a great portion of the arguments, used by the captor's counsel. Whether they are seriously insisted on, for the purpose of condemnation, or to repel the claim of damages, I cannot accurately determine. The case will not rest with me, and I shall therefore leave the ultimate decision to superior tribunals; contenting myself with such observations as occur to me, in the progress of my march to the consummation of my duty; which is to place the case in a situation for an appeal.

I have changed accidentally, the order of the points, and shall make some observations on them, in the method in which I have stated them. Here is an American vessel, clearly documented as such—with an American cargo, indisputably belonging to citizens of the United States—sailing on a lawful voyage—cleared out for the port to which she was destined—and, on that voyage, captured as prize, by one of our own public ships; under none of the circumstances generally justifying suspicion of fraud, or concealment, either of destination, or enemy interests—acknowledged to be engaged in a fair and lawful trade—without the most distant imputation of ulterior commerce with the enemy, save that as much of the proceeds of her outward cargo, as remained (after paying contingencies and finishing a cargo or ballast, of salt, with which she was to return to the United States, and again pursue the course of trade into which she had now entered) was to be remitted, to London in bills of exchange, not specified to be English, but goods bills, and in one part, good bills on England, the remittance to be made to American citizens, permitted to remain there. Were these proceeds at any time to be lodged for enemy account? The direct contrary appears. In every instruction from the shippers, the declaration, that the funds were to remain for their use, and at their order; is made and reiterated. Nor do the counsel for the captors allege, that the declaration was fallacious. They could not allege this without violating all candid and plain evidence of the fact; and of this they are incapable. But, it seems, they discover what I must doubt whether the captor ever thought of, that remitting the proceeds in bills of exchange, though it had been the course of trade before the war; is now the same as if merchandise, or money, had been sent. And thus an ulterior destination, or trade with the enemy, is endeavoured to be shown from the papers found in the ship; and the ulterior destination being alleged to be unlawful, the vessel and cargo are said to be forfeited as prize; though the commencement of the voyage be legal. If their premises were sound, their conclusion would inevitably follow. For no trade can be lawfully carried on indirectly with an enemy, by going first to a neutral port, and investing there the proceeds, in a cargo, sent, in continuity of an original or otherwise unlawful plan, to an enemy's country. I shall omit taking notice of cases on this point. If applicable here, they would prove the position taken by the counsel.

I do not dispute the general doctrine, but its application depends on the identifying bills of exchange, with bullion, or merchandise. Now, although a definition of a bill of exchange, according to the phraseology of Blackstone, and a dictum of a Pennsylvania

court, from 2d Dallas, is introduced, to show the sense of the elementary writer, and the opinion of that court, on the nature of a bill of exchange; and it is defined by the one, and held by the other, to be "a mode of remitting money;" and equivalent thereto, in legal contemplation; I am not convinced that the definition, or the opinion, is as a general position, practically sound or correct. For, though true it is, that it is "a mode of remitting money;" mercantilely speaking, it is the mode of establishing a credit, which serves the purposes of money; often effected without the intervention of bullion, or actual money; and not adding to or deducting from, the aggregate of bullion or money, of the country in which the credit is placed. Technically the deposits may be called funds. But this means, any stock or capital, on which credit is founded. It does not necessarily imply money. It would, indeed, be a severe application of definitions, or dicta, to found on them the ruin of our own citizens, engaged in a commerce, undeniably lawful; so far as it had proceeded. With all the industry of the captor's counsel, they have not produced a single decision, directly to their point. In Chitty's Practical Treatise on the Law of Nations, &c. in 1812 (Boston Ed.) 25, it appears, that no decision had taken place in England, to prove the illegality of bills of exchange, drawn in one enemy country, on another. Nor can I find one, so far as my opportunities enable me to search, in any book of legal authority, of any other country. Chitty's words are, "An attempt was made by the counsel, in the case of De Tastet v. Baring, 11 East, 268, 2 Camp. 65, to establish, that no bill drawn from an hostile country upon this, could legally be passed here; but upon this point the court do not appear to have given any opinion. In several recent instances, of bills drawn by British prisoners in France, upon this country, holders, with full notice of the circumstances, have been permitted, at nisi prius, to recover; on this ground, that otherwise prisoners of war might be deprived of the means of comfortable subsistance." It seems, then, that even common law courts, consider the convenience and necessity of a case, a sufficient ground for its legality. On the like convenience and necessity, Sir W. Scott has restored goods, withdrawn from an enemy's country, without a license for so doing; which, in ordinary cases, is essential. 4 C. Rob. Adm. (Eng. Ed.) 195. I do not believe, that any one acquainted with the trade to Cadiz, will assert that it could be carried on, to any great extent, without the purchase of bills on England, or those ultimately resulting in British funds. It was inextricably interwoven in the trade, before the war between this country and England; and is now quite as much required. True, you can get bills on other countries; but these, by a circuitous operation, generally result in British funds. Cargoes, equal to the proceeds of those we send, cannot be obtained. Specie may sometimes be exported by permission. It is sometimes, secretly and at risk, brought off; but the general current of dealing is, to vest the proceeds in bills of exchange; and British bills are the most common; and most beneficial for us to buy, or receive in payments. True also, the British agents make purchases in the Cadiz market, in one way or other, of some of our cargoes, in common with or through the intervention of the Spanish government, or subjects. But, if we do not carry our commodities directly on British account; sales to British agents at Cadiz, without any preconcert, are as lawful, as are those to any others. Sell them to whom we may, British bills are common in payment. Of what advantage, then, would be our lawful commerce to Spain and Portugal, if it were settled by our courts, that remittances of those bills, or intention to remit them, forfeited our vessels and cargoes, if intercepted, by our cruisers on their passage? Shall not therefore, our courts, and especially our prize courts, to whom great latitude is given by the laws of nations, consider convenience and necessity? Particularly in a case wherein no law of our own country, or of nations, can be found, forbidding, in any definite terms, these paper operations: for I consider them, in practical effect, nothing more, and in fact, leaving a balance favourable to us, and against England; at the close of the whole transactions. I am not convinced to the contrary, by the ingenious constructions and deductions and consequences from, what the counsel for the captors deem principles. Their mode of cutting up this trade by the roots, would be accomplishing, through the judiciary, the destruction of one of the few branches of commerce remaining to us. However well or ill founded, objections to remittances of proceeds to the country of the enemy, or sailing under its passports, may be; the trade will be short lived, unless both are permitted. The aid of our own cruisers will not be required for its complete extinction. If it be deemed right, that this trade should be abolished, let it be done by the legislature, if they shall think proper, and not in an indirect way.

In the course of the hearing, I threw out for inquiry, my belief that since our declaration of war, bills of exchange on London, to a large amount, had been purchased, and remitted by the treasury department of the United States; and probably, to be sent into a country hostile to Great Britain. I have it in my power to prove, by indisputable evidence, that my belief was well founded. I mentioned the fact (for so it is) not with the view of thereby alone establishing its lawfulness—for if it were illegal, that could only be done by an act of the legislature—but to show the sense of a department so extensively influential and exemplary, as to the innocence and policy of the practice. Can it be contended, with any candid or forcible argument, that a citizen shall be liable to forfeiture of his prop-

erty, for an operation essentially necessary in the course of his trade, which has been sanctioned and practised on, by an authority so high? Let it not be said that "this was a governmental act; and a government can do what an individual cannot." A fiscal officer is not the government, nor would he do any act contrary to our laws, or to those of nations. The legislature have refrained, with a full knowledge of the mode in which purchases and payments are made, and every other circumstance concerning it, from passing any prohibitory law, either against the trade or the passport, used for the safety of our ships. They have not only refrained, but refused in effect, to pass inhibitions. But all this would operate as a trap to our citizens; simply presuming themselves pursuing lawful voyages, while they are subject to capture by our cruisers, and condemnation by our courts.

I can see a strongly marked distinction between a solitary case of a voyage, begun with a view to lodge permanently, and mix with the mass of enemy property, the proceeds in an enemy country; and voyages lawfully made, wherein the interest of trade indispensably require payments in bills, to be remitted to a hostile country, to be drawn out again for the use of the trader. I agree that while in transitu, as I conceive it, though temporarily commorant in the enemy state, they may by an act of power be seized, taxed, or used. But the interests of states at war, in the times now existing, and particularly of England, forbid such exercises of power. The spell of confidence in her good faith, would be at once dissolved by any violence committed by her government, in regard to funds placed within her control. I depend for results on the interests of nations, more than on mere refined or laudable motives. I am not exactly informed, but I believe that intercourse of exchange is common between hostile countries generally, though it may be subject to more or fewer interruptions in some than in others. No period of history ever exhibited so extensive a scene of warfare and desolation, as the time in which we live. Relaxations of old principles, better settled than the one now contended for, necessarily take place, in the present state of the world among nations at war. Shall we then, to whom such relaxations are as necessary as they can be to any other nation, insist on their severities, and visit them on the heads of our own citizens? The old routine of a kind of barter, by sending cargo for cargo, has long ceased. Credits, called "funds," or the paper representations of them, are lodged in one part of the globe, for enterprizes of trade in any or every part of it. They are placed in the country, either directly or circuitously, from whence they can be most conveniently drawn, or in which with most safety, they may temporarily remain. With the country, now our enemy, we have long had, and since the war, have innocently continued

extensive commerce. We have large amounts of funds lodged there, and owe considerable debts. Intercourse by exchange is more particularly required with them than with any or most other countries, for obvious reasons. I believe funds are withdrawn and debts paid, in and by bills of exchange every day. I am told that government ought to consent, even to payments of "debts." I think justice and good faith require, that we should continue paying; and though an act of the British parliament makes the intervention of the secretary of state necessary, there is no prohibition till government prohibits. Vide 8 Term R. 71. The machinery of exchange, when even solid funds are its moving powers and principle, is in fact, buying a debt, and innocently and justly accomplishing its payment. I am referred to a transaction in England in the time of Mr. Pitt, when an act of parliament was passed, originating in the intention (whatever were the terms in which it was conceived) to prevent French citizens from withdrawing their funds. This was done to save the property of a class favoured by Great Britain, and on a special emergency, and not on a general principle. It proves, however nothing more strongly, than that it required an act of parliament to prohibit, what was before lawful.

Having in the best way I am capable of, disposed of the most important parts of the points in discussion, I might leave without multiplying remarks, the objections made on the subject of the 1910 dollars, to be assessed on all the cargo, and remitted to Williams for account of Coolidge, who is also an American citizen; and the instruction given by Samuel May to Farris, as to the ultimate investment of the proceeds of his adventure. The circumstance of Williams, Coolidge, and for aught I know to the contrary, Bromfield, being American citizens, and Coolidge resident in the United States, I only mention to show the improbability of British interests. For one of our citizens resident in a foreign country, in a permanent situation as a trader, is identified with a subject of that country, to certain intents. Nevertheless, at the breaking out of an unexpected war, though a citizen may have been commorant in a house of trade before hostilities reasonable time for his return to his country ought to be given, before either he or his property be treated on a hostile footing by us. It does not appear for what purpose the 1910 dollars are to be assessed, and used by Coolidge. It is all conjecture; but let it be granted, that it is as compensation or bonus for A. Allen's certificate of the safe conduct or passport, hereafter mentioned. I see not that this, either in its principle or amount, should work either condemnation or justification of the capture. Coolidge may have obtained the document, and sold it at what price he could obtain—and yet no illegal effect be produced. I believe it is notorious in all countries, that passes or licenses, from even sovereigns, are ob-

jects of purchase and sale in the market; and who receives the benefit of them is not an essential inquiry  On a presumption so vague, and with no other ground for certainty or conjecture, I cannot conceive the capture can be justified.  If the whole of the shippers receive whatever advantages it can afford, they ought proportionately to pay the expense of obtaining it.  I say nothing in approbation of the practice; but I know of no law inflicting confiscation on those who engage in it.

The last ground taken by the counsel for the captor, on this part of the subject, is, that of the instruction by Samuel May to Farris. In whatever mode the proceeds of his adventure were to be remitted, it must so be for May's account.  Let it be remembered, that Farris in his general instructions, is inhibited from violating the laws of the United States (the laws of nations being included in them) or those of the places he may visit.  This was an abundant caution;—he was bound to observe those laws, without specific instructions.  But with all this monitory caution and his general obligation, should I be warranted in presuming, that he will take an illegal mode of remittance?  He is not compelled by any duty to his principal, to remit cargo, or any article in breach of the laws of nations, or those of his country; however apparently advantageous, such remittance might be.

The remaining point insisted on by the counsel for the captor, is the illegality of the safeguard, contract, or passport, called, in my opinion, improperly, a license.  The paper which has been the theme of so much observation, I do not classify among those acts of sovereignty, styled licences, which in modern times have increased in number, beyond all former example.  It would be a most toilsome, and in this case, an unnecessary task, to go into a history of their nature or objects. I have read many discussions on the subject of them, and have reaped very little substantial benefit by the perusal.  British writers disagree, as to their principles and utility; even to the nation from whose government they issue.  Some, reprobate them as stimulants and incitements to perjury, and immorality of various kinds.  They declare them injurious to England; and even that they have rendered their whole system of maritime law, as it regards commercial rights and regulation nugatory; and have torpified their navigation act, into a dead letter. They have thrown advantages, at the expense of their own ship-owners, into the hands of enemies and neutrals.  But my reading on this subject is not very extensive.  I have however, never before met with any complaints by neutrals, or enemies to England, while their subjects or citizens possessed advantages and freedom from capture, under these partial exemptions from the rigors of war.  I agree with the counsel for the captors, that when a licensed trade is opened generally, or by special license, which is only

tolerated by such license, and was not before free or lawful, as between ports of enemies; the consent of both sovereigns is necessary. It could not be effected without such mutual agreement.  But I deny, that where a protection is given by one sovereign to the ships of his enemy, employed in a trade not depending on a license, but lawful to the vessel protected, any consent of both governments is necessary.  Suppose a case, that Great Britain were to order generally, all her cruisers to abstain from captures of our ships bound to Cadiz or Lisbon, with certain cargoes. Would any one contend that our government should consent before our ships could enjoy the benefit? and that we should condemn our vessels, for sailing in safety, under such general orders to British cruisers?  Where, then is the difference between all, and one vessel so sailing, always taking it for granted that there is no fraud in the case agreed, that British interests not immediate, but in some way, ultimately implicated, prompt such exemptions and indulgences?  But this renders not the exemption illegal, or less beneficial. Quixotism among nations, is not to be looked for.  Some consideration of benefit is always at the bottom of concessions of this nature.

The class of cases whereof The Hoop, in 1 C. Rob. Adm. 196, is the leader, may be dismissed from our notice; as not applying to a lawful trade, not one of course, depending on licenses.  Our trade with Lisbon or Cadiz cannot be affected by the principles laid down in the case of The Hoop.  It is a lawful trade to us; and all the advantage we enjoy from British passports, more commonly than correctly, called licenses, is freedom from capture by their cruisers; while we are prosecuting our lawful voyages.  When a trade is deemed by one enemy, only beneficial to its adversary; it may, and does, refuse to consent to its subjects, or citizens, receiving licenses, or privileges, to engage in the traffic.  Trading to enemy ports is unlawful in itself; and is often forbidden, and punished, by municipal laws.  Such is our case as to trading to British ports.  But although passports, called licenses, have long been in use, to exempt from British capture, vessels going from one lawful port to another; no instance can be shown, in which the consent of our government was ever asked, or deemed necessary. Our government may inhibit the practice, but until they do, I must act according to the suggestions of my own judgment.

Having, to preclude repetition, made these general observations, calculated to meet objections made in this cause, I proceed to consider the paper, to which the law respecting licenses has, in my view of it, been improperly applied.  Although common parlance and common acceptation, do not amount to legal definition;  they often lead to a good classification and understanding of subjects.  Our merchants have habitually fallen into a nomenclature of the various British exemptions from capture, current among us, which is de-

scriptive of more than the mere names. Some are called Fosters, some Sidmouths, and those whereof that under consideration is one, are called (not Allens but) Sawyers. Now, according to the drawing exhibited in the objections made on behalf of the captor, Admiral Sawyer is thrown in the back ground, and Mr. Allen is brought prominently forward; I cannot see that the fact, or law of the case, warrants this mode of grouping and placing the figures. It is said, "that Mr. Allen has presumed to exercise a portion of sovereignty, within our territory, and that the captured have assisted him, in this invasion of our national rights and dominion." I have read the paper over and over again, and confess I can see nothing in it, to justify so serious a charge. I see more official form used, possibly from a lingering habit, and not intentional offence to us, than was necessary; and which might have been omitted. But, strip the paper of such redundancies, and it is nothing more than a certificate (calculated to operate on the British commanders, and with no apparent view to interfere with our sovereignty, or to assume any right to exercise the power of his own sovereign, in a way substantially offensive to us) purporting that Admiral Sawyer had written to him, a letter, whereof he attests a copy; by which it appears, that our vessels laden with dry provisions, unarmed, and bona fide bound to Portuguese, or Spanish ports, are not to be molested by the squadron under his command." It appears, that this was done by Admiral Sawyer; in furtherance of the views of his majesty's government; and therefore if any act of sovereignty exists in the case, it was exercised out of our territory. And it is as much exterritorial, as are the Sidmouths; which are acts of sovereign authority, inchoate in England, but consummated here. For they are sent in blank, sold in our market, and filled up, within our territory, with the name of the vessel, description of the voyage, &c. by those to whom the distribution is committed. And yet the counsel allow, there is no invasion of territorial rights, or sovereignty, or any illegality, in such passports. Now I cannot see that Mr. Allen's conduct is more offensive, or illegal, than is that of those who perfect a Sidmouth, and apply it to the vessel and voyage requiring it, by filling up the blanks, and thus consummate the validity of the document, within our territory. What are called Foster's are permissions or passports from the ex-minister Mr. Foster, many, if not all, composed or perfected and delivered, within our territory; and given by one who had no more authority, as it regarded us, than has an ex-consul. In the case of The Tulip [Case No. 14,234] I laid it down, that Mr. Foster's passport would not have been illegal, had it not been accompanied with the engagement of the vessel in enemy service. This opinion was confirmed, or not objected to, by the superior court. The council do not dispute, on the contrary they allow, the innocence and legality of such passports. But I am told, that the Sawyer safe conduct or passport—for so I consider it, —includes a contract, that the vessel shall go to the place designated, and no other; and it is therefore an engagement with the enemy. I see no such engagement. Every one knows, that passports, or even licenses are forfeited, and are no longer protections, if used for other voyages, or purposes than these designated. If those possessing the limited indulgence, choose to deviate, and forfeit its advantages, they have their election.

A Sawyer (for brevity sake, I use the current nomenclature) contains a permission to return safe, with lawful cargo; for so Mr. Allen certifies was Admiral Sawyer's intention. A Sidmouth, I believe, does not thus continue the permission. It is only material to the party concerned; and the return privilege is no more offensive to our laws, than that for the out passage. But it is said Admiral Sawyer had only a limited command, over a squadron. This and many other objections, would have been more in place, in a British prize court. But the more limited his authority, the less proof is there, that either his act, or that of Mr. Allen, was one of sovereignty. The English government have not viewed either Mr. Foster's or Admiral Sawyer's permissions, or safe conducts, as sovereign or national acts; for they have thought it necessary to confirm and validate them. If this be so, why we should consider the paper in question as an exercise of sovereign authority, for the purpose of implicating our citizens in the consequences, and thereby forfeiting their property, I cannot account, or reconcile with my opinions, either of law, or of principles of justice. This would be inflicting on our citizens, under pretext of participation, the penalty incurred, as it is alleged by Mr. Allen, for his supposed offence. But, "the consular seal was directed, by Admiral Sawyer, to be affixed to any copy of his letter, accompanying the papers of the vessel using it," as a safe-guard, or warrant to pass. With regard to us, this is of no consequence. The whole paper, and all other such, are not to operate within our territory. To us, and our laws, they are of no more validity, than are the forgeries of other passports, which have been plenteously spread through our country. But to British cruisers, on whom alone they are to operate, it is important that the documents should be genuine. The impression of the consular seal was therefore, a symbol, essential to show that the paper was not counterfeit. This emblem might have been any thing else, but the seal had been known, and respected. Mr. Foster may have innocently sealed his passports, with armorial bearings; a pageant of British heraldry, of which I do not mean to speak with disrespect. But they are as obsolete, and of as little authority among us republicans, as is the impression, or are the emblems, of a vacated seal of an ex-consul. The one

however, is as harmless as the other. We are not to judge for those whom such impressions are to affect; nor are we to mulct our citizens in forfeitures, on account of them; or because a late consul had raised up the shades of his departed formularies, after his office was defunct.

Mr. Onis's passports are agreed to be harmless and lawful. Yet they are given within our territory; by one, however worthy and respectable, yet not as I believe, formally acknowledged. I have merely noticed these and others, by way of illustration; and I think it useless to add more, though it might be done.

The embers of Mr. Genet's transactions are disturbed, for the purpose of comparison between this case and them. Trouble enough had I, in the unpleasant period of their existence; and when the subject was now brought up, the "jubes renovare dolorem" suggested itself to my mind. I shall speedily dismiss it. I do not see any resemblance. The one was an egregious violation of our territorial rights, and of the laws of neutrality. Courts, attempted to be erected in our country; cruisers, fitted out to annoy our then friend; foreign commissions, issued for warlike purposes, in the country of a nation at peace; our citizens seduced from their duty; and the whole tending to involve us in war. The present, so far as it reaches, has a direct contrary tendency. I have said enough, whether correct or not, to show my sense of the subject now under my consideration; and from my preceding remarks it will be seen, how little analogy there is in my opinion between the cases.

I shall also dismiss as concisely, the remarks made on the instructions given to Farris; for I have really extended my observations, led on by the general importance of the subject, to a length I had not myself contemplated. No mention is made of the Sawyer in these instructions: only general observations on the probability of British indulgence. I see nothing reprehensible in this. If Admiral Sawyer's command extended only to limits short of Cadiz, there was a part of the track unprotected: to which those general observations applied. The caution to avoid French boats, &c. was not unwise or unlawful. Our vessels have been captured by them, under pretexts less solid, than having an enemy pass on board. The injunction to avoid all vessels, was not reprehensible; even if it included our own. I must say, with most sincere regret, and not with the most distant idea of asperity, that I think the present claimants, have sufficient proof of the prudence of that precaution.

The only remaining point is, in what manner, or on what terms, the restitution of this vessel, and cargo, are to be made? For it may be perceived, that it is my intention to restore them to the claimants. I hold it to be my duty, as it is my inclination, to render every assistance within the scope of my ju-

dicial authority, to our cruisers conducting themselves with propriety. But I am also bound to protect the captured, from unnecessary seizures, delays, and losses, when I think the capture unlawful. The bias in foreign courts (complained of by us, when neutrals) to throw every thing, in any way possible, into the scale favourable to captors, must not be imitated among us. How to define with precision—"probable, or reasonable cause," is a difficult task. I shall leave it to the superior courts. For myself, I think, I should rest on strong facts, apparent at the time of capture. Such as double papers by way of deceit, but false and colourable; want of proper ship's papers; prevarication by the master, or other officers and crew, examined in preparatorio, which, in this case has not been brought to the test, by the conduct of the captor; false destination; papers thrown overboard, &c. &c. But these are all facts. I cannot conceive that a cruiser is excusable, for sending in a vessel of a friend, or of our own citizens for adjudication, on mere points of law. If they are against him, he takes the consequences. And I think this is the situation of the captor in this case.

It remains now, that I close a discussion, protracted by the novelty of the subject, the variety of matter suggested in the course of the hearing, and the considerations rising out of the circumstances of the case. That the vessel and cargo should be restored, appears to my mind, clearly shown. As to damages, there are some which inevitably follow restitution; however open to objection, others may be deemed to be. The vessel must be restored in the condition in which she was, in every respect, at the time of capture. Abstracting the officers and crew was unjustifiable; and every expense consequential on that, as well as other circumstances, entirely out of any questions of probable cause, ought to be retributed. I decree, however, generally; that the vessel and cargo be restored to the claimants, with damages and costs.

[NOTE. Reversed by the circuit court. Case unreported. On appeal to the supreme court the decree of the circuit court was affirmed. 2 Wheat. (15 U. S.) 143.]